Melanie E. **DAMIAN**, as Receiver for the Estate of Aubrey Lee Price, PFG, LLC, Montgomery Asset Management, LLC f/k/a PFG Asset Management, LLC (a Florida limited liability company), Montgomery Asset Management, LLC f/k/a PFG Asset Management, LLC (a Georgia limited liability company), and PFGBI, LLC, Plaintiffs,

v.

MONTGOMERY COUNTY BANK-SHARES, INC. and Trae D. Dorough, as President and Chief Executive Officer, Miller Peterson Robinson, as Director, and Dee Ann McDaniel, as Chief Financial Officer, Defendants.

CIVIL ACTION FILE NUMBER
1:12–cv–4472–TCB

United States District Court, N.D. Georgia, Atlanta Division.

Signed 03/31/2015

Andrew E. Worrell, Petitt Worrell Craine Wolfe, LLC, Atlanta, GA, Guy F. Giberson, Kenneth Dante Murena, Pro Hac Vice, Peter F. Valori, Guy F. Giberson, Damian & Valori LLP, Miami, FL, for Plaintiffs.

Adam Scott Rubenfield, David J. Hungeling, Law Office of David J. Hungeling, P.C., Atlanta, GA, Andrew Townsend Sumner, Alston & Bird, LLP—Atl, Theodore Joseph Sawicki, Alston & Bird, LLP–GA, Atlanta, GA, for Defendants.

## ORDER

Timothy C. Batten, Sr., United States District Judge

This case is before the Court on Defendants' motions to dismiss Plaintiff Melanie Damian's third amended complaint (the "complaint") for failure to state a claim [59; 60].[1]

### I. Background

#### A. Parties and Statement of Facts[2]

Damian filed this lawsuit in her capacity as Receiver of the Estate of Aubrey Lee Price, PFG, LLC, Montgomery Asset Management, LLC f/k/a PFG Asset Management, LLC (Florida limited liability company), Montgomery Asset Management, LLC f/k/a PFG Asset Management (Georgia limited liability company), and PFGBI, LLC (collectively, the "Receivership Entities").[3] Defendant Montgomery County Bankshares, Inc. ("MCB") is a holding company for Montgomery Bank & Trust (the "Bank"), a federally licensed bank in Georgia. During the time period relevant to this lawsuit, Defendant Trae D. Dorough was the chief executive officer of MCB and the chief executive officer, president and chief lending officer of the Bank. He was also a member of MCB's board of directors and sat on the board's loan committee and coastal loan committee. Defen-

1. Two separate motions to dismiss were filed in this case—one by Defendant Montgomery County Bankshares, Inc. and one by the individual Defendants. Because their arguments substantially overlap, the Court will refer to the arguments of "Defendants" generally.

2. This statement of facts is derived from the third amended complaint [58] and the documents incorporated therein by reference. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). The Court also concludes that the call reports, which are referenced heavily in that pleading but are not attached thereto, are subject to judicial notice based on the reasoning of *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999). Although *Bryant*

dealt with legally-required filings with the SEC, the Court believes the same principles apply to the Bank's publicly-filed call reports in this instance, and neither party appears to challenge the propriety of noticing the call reports. At the motion-to-dismiss stage, the Court accepts as true the factual allegations in the third amended complaint and construes them in the light most favorable to Damian. *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009).

3. On August 10, 2012, Damian was appointed as Receiver of the Receivership Entities in connection with an enforcement action filed by the Securities and Exchange Commission, case No. 1:12–cv–02296–TCB, in this Court.

dant Miller Peterson Robinson was a director of MCB and served on the executive committee and audit committee. Defendant Dee Ann McDaniel was the chief financial officer of MCB and was the chief financial officer of the Bank during 2010. Throughout this Order, Dorough, Robinson and McDaniel are referred to collectively as the "individual Defendants."

The allegations in the complaint stem from PFGBI's December 31, 2010 purchase of three-quarters of the common stock in MCB for a purchase price of over ten million dollars. Damian's central allegation is that Defendants misstated the value of MCB's loan portfolio, its most significant asset, by "vastly understating" the allowance for loan losses (referred to as "ALLL")[4] in a private placement memorandum issued by MCB and in the Bank's "Consolidated Reports of Condition and Income for a Bank with Domestic Offices Only—FFIEC 041" (referred to as "call reports"), which were publicly filed on a quarterly basis. [58], ¶¶ 10–11. Damian also alleges that Defendants Dorough and Robinson made certain verbal misstatements to Lee Price, PFGBI's manager, and Dan McSwain, PFGBI's largest investor, regarding the loan portfolio and that Defendants concealed from PFGBI reports regarding the loan portfolio prepared by Steven H. Powell & Company (the "Powell Reports").

In an effort to address capital needs of the Bank, MCB issued a private placement memorandum (the "PPM"), dated April 9, 2010, for use in marketing MCB's stock to potential investors. The PPM, which was provided to PFGBI, provides background and financial information regarding MCB and the Bank and the offering of MCB's stock. Among other things, the PPM notes

that the Bank was subject to an October 6, 2009 cease and desist order issued by the Federal Deposit Insurance Corporation ("FDIC"), which required the Bank to take a number of actions to increase its health, including steps to substantially reduce the amount of the Bank's debt classified as "doubtful" or "substandard." The PPM notes that MCB planned to use proceeds from the offering to supplement MCB's capital base and provide flexibility in addressing MCB's "nonperforming assets" and "the potential for continued deterioration in [MCB's] loan portfolio." [58–1] at 7. The PPM also includes certain information from MCB's 2009 financial statements, including a calculation of ALLL. According to the PPM, as of December 31, 2009, loans (less the allowance for loan losses) constituted approximately $154.5 million of the approximately $247.9 million of combined assets of MCB and the Bank, or 62.3 percent. The PPM indicates that the ALLL was $1,881,000 as of December 31, 2009.

In the late spring of 2010, PFGBI and MCB began discussing the possibility of a transaction. Representatives from PFGBI and MCB met with banking regulators in the course of this process. The Bank continued to publicly file call reports during 2010. These filings reported an ALLL of $1,743,000 as of March 31, 2010; $3,839,000 as of June 30, 2010; and $3,528,000 as of September 30, 2010. PFGBI and its representatives, including its counsel Nelson Mullins, also met with MCB representatives and engaged in due diligence during the spring and summer of 2010. During these meetings, MCB indicated that the Bank had written off unusually high loan losses because of foreclosures in 2009 and 2010.

---

4. ALLL typically stands for the allowance for loan and lease losses. According to Damian, the allowance for lease losses appears to have been negligible, so allowance for loan and lease losses and allowance for loan losses are essentially interchangeable in this case. [58] at 9.

During due diligence, PFGBI focused largely on the Bank's owned real estate. It did not review, and was not provided, copies of the Powell Reports during due diligence. The Powell Reports are quarterly reports that examine a sampling of past due loans of various sizes. Among other things, the reports analyze trends in asset quality; review violations and other issues identified regarding the loan portfolio and administration; and provide a review and classification of individual loans. During the review, loans are assigned individual numbers or "grades" that correspond to various levels of quality: special mention, substandard, doubtful, and loss.[5] According to the Powell Reports, in December 2007, 4.16% of the Bank's loans were classified as adverse, and this percentage increased to 14.61% in December of 2008; 28.43% in September of 2009; and 33.83%, a historical high, in December 2009. In 2010, adversely rated loans remained high compared to 2007. They constituted 28.28% of the Bank's loans in April 2010, 33.6% of the loans in May 2010, 38.39% of the loans in July 2010, and 39.24% of the loans in October 2010.

PFGBI's purchase of MCB closed on December 31, 2010. In 2011, approximately six months after the purchase, the FDIC conducted an audit of the Bank, forcing the Bank to write down more loans. In the months after PFGBI purchased MCB, MCB wrote down several millions of dollars of loans, and in July 2012, the Bank was put into FDIC receivership[6]

## B. Procedural History

The third amended complaint constitutes Damian's fourth iteration of her claims against Defendants. On December 28, 2012, Damian filed her initial complaint, alleging that Defendants were liable for violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the regulations promulgated thereunder. On June 24, 2013, in lieu of filing an answer, the individual Defendants filed a motion to dismiss, identifying various pleading deficiencies in that complaint. On July 11, 2013, Damian filed her first amended complaint, re-asserting her 10b–5 claims with additional supporting allegations and also alleging common law fraud and negligent misrepresentation.

On July 29, 2013, Defendants filed motions to dismiss the first amended complaint. On November 8, 2013, the Court granted Defendants' motions to dismiss, concluding that Damian had failed to allege her federal law claims with sufficient particularity. The Court also declined to exercise supplemental jurisdiction over the state law claims because Damian failed to plead a basis of original jurisdiction over these claims.

In its November 8, 2013 Order, the Court granted Damian leave to file a second amended complaint to cure the deficiencies in the first amended complaint. On December 16, 2013, Damian filed her second amended complaint, and the Court subsequently granted her leave to file a third amended complaint, which she filed

---

5. The substandard, doubtful and loss classifications are discussed in more detail below.

6. Damian alleges that between the time PFGBI bought the Bank on December 31, 2010 and June 30, 2012, the Bank was required to write down over $25 million from its asset portfolio, the vast majority of which were loan write-downs. However, as Defendants point out, it appears that Damian is

double or triple-counting the quarterly numbers. Based on the call reports for December 31, 2011 and June 30, 2012, net charge-offs appear to have been approximately $7.1 million for 2011 and $4.2 million for the first half of 2012. At any rate, it is clear for purposes of the pending motions that the Bank charged off several millions of dollars of loans during the eighteen months following PFGBI's purchase.

on March 7, 2014. On April 7, 2014, Defendants filed their motions to dismiss the third amended complaint (referred to for the remainder of this Order as the "Complaint"), and on March 6, 2015, the Court held a hearing on the motions.

In the Complaint, Damian alleges that MCB violated Section 10(b) of the Exchange Act and Rule 10b–5 and that the individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. She also brings state-law claims of common law fraud, negligent misrepresentation, and aiding and abetting. For each claim she seeks damages in the amount of PFGBI's investment in MCB plus interest and, with respect to her federal law claims, attorneys' fees.

## II. Legal Standard

As the Court explained in its November 8, 2013 order,[7] to survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the court need not accept as true plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

■ In addition to satisfying general pleading standards, with respect to at least four of her five claims, Damian must satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and/or Rule 9(b) of the Federal Rules of Civil Procedure.[8] *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Section 10(b) of the Exchange Act and Rule 10b–5 make it unlawful for an individual to employ a manipulative or deceptive device in connection with the purchase or sale of any security. 15 U.S.C.

---

7. In its November 8, 2013 order, the Court explained in detail the pleading standard for Damian's federal law claims, including the pleading standard with respect to the individual elements of a 10b–5 claim. The Court has largely reiterated those standards in Sections II and III of this Order, but additional detail and analysis may be found in the November 8, 2013 order.

8. In their motions and responses, the parties do not explicitly address the pleading standard applicable to Damian's aiding and abetting claim. In her responses, Damian appears to assume that the heightened pleading standard of Rule 9(b) would apply to the aiding and abetting claim, but in a hearing before the Court, Damian indicated that the general standard of pleading would apply. For purposes of this Order, the Court assumes that the less-stringent general pleading standard applies.

§ 78j(b); 17 C.F.R. § 240.10b–5. To state a securities-fraud claim under these provisions, Damian must allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). Pursuant to the PSLRA, Damian must plead the first two elements with particularity.[9] Specifically, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The Complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A).

Although her state-law claims are not subject to the requirements of the PSLRA, Damian must still satisfy the heightened pleading requirements for fraud under Rule 9(b) with respect to her claims for common law fraud and negligent misrepresentation. Rule 9(b) requires her to "state with particularity the circumstances constituting fraud." However, unlike the PSLRA, Rule 9(b) provides that intent "may be alleged generally."

## III. Discussion

As noted above, the Court previously dismissed Damian's first amended complaint. There is no question that Damian has added a substantial amount of material to her complaint since that dismissal. Damian has added over forty pages of allegations, including additional information regarding the definitions of ALLL and various loan classifications; additional information related to the Powell Reports; allegations that MCB concealed the Powell Reports from PFGBI; calculations comparing the percentage of adversely rated loans to ALLL as a percentage of loans over a period of time; and allegations that the individual Defendants advised Price that MCB's risky loans had been dealt with through foreclosure procedures and that therefore PFGBI should focus its diligence on MCB's real estate portfolio. The question is whether these additional materials and allegations cure the deficiencies in Damian's prior complaint.

In their motions to dismiss, Defendants contend that, like the first amended complaint, the Complaint fails to state a claim under Section 10(b) of the Exchange Act or Rule 10b–5 because Damian has failed to sufficiently plead (a) a material misrepresentation or omission, (b) scienter, (c) justifiable reliance, and (d) loss causation. Defendants contend that Damian's state-law claims fail for similar reasons. Further, as Defendants note, if there is no well-pleaded 10b–5 claim against MCB, the alleged primary violator, the federal claims against the individual Defendants must also fail. The Court will first address Damian's federal law claims and then Damian's state-law claims.

### A. Federal Law Claims

#### 1. Material Misrepresentation or Omission

■ To satisfy the pleading requirements of the PSLRA and Rule 9(b), the

---

**9.** As indicated in the Court's November 8, 2013 Order, the elements of justifiable reliance and loss causation are subject to the general pleading requirements cited above.

Complaint must *"precisely"* identify each allegedly misleading statement—its content, when and where it was made, and who was responsible for making it. 15 U.S.C. § 78u–4(b)(1); *FindWhat Investor Grp.*, 658 F.3d at 1296 (emphasis added). The Complaint must also specify why the statement is misleading and how it misled the plaintiff. *Id.* And if the plaintiff's allegation that the statement is misleading is made on "information and belief," then the Complaint must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *see also FindWhat Investor Grp.*, 658 F.3d at 1296. Finally, the Complaint must specify what the defendant gained as a result of making the false or misleading statement. *FindWhat Investor Grp.*, 658 F.3d at 1296.

As the Court held in its November 8, 2013 order, Damian did not become a receiver of PFGBI and the other Receivership Entities until well after the events that form the basis of the Complaint. Therefore, allegations based on her review of documents in the course of her duties as receiver are allegations made on information and belief for purposes of the PSLRA. This does not mean that Damian must specifically plead *all* facts that gave rise to an allegation based on information and belief, but she must "plead with particularity *sufficient* facts to support those beliefs." *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000). Among other things, when relying on internal reports, Damian must specify which reports she is relying on, "who prepared them and when, how firm the numbers were or which company officers reviewed them." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)) (internal quotation mark omit-

ted). In other words, the Complaint must set forth sufficient information about the documents to allow both the Court and the Defendants to understand the foundation or basis for Damian's belief.

As Damian notes in her response, the alleged misrepresentations and omissions set forth in the Complaint generally fall into one of three categories: (a) written false statements regarding ALLL in the PPM and the bank's publicly-filed call reports; (b) Defendants' concealment of the Powell Reports from PFGBI; and (c) verbal misrepresentations by Dorough and Robinson indicating that the Bank's problem loans had been dealt with. However, all of Damian's allegations ultimately rise or fall on Damian's central contention that the Powell Reports demonstrate that Defendants knowingly and repeatedly understated ALLL in the months leading up to the transaction with PFGBI. The Court will therefore begin with the allegations regarding the misstatement of ALLL, a subject to which the parties rightly devoted most of their attention.

### a. Misstatements of ALLL

In Exhibit B to the Complaint [58–2], which summarizes Defendants' alleged misstatements, Damian points to five separate statements of ALLL. Specifically, Damian alleges that Defendants misreported ALLL in the PPM and in call reports for the fourth quarter of 2009 and the first, second and third quarters of 2010.[10] As support for her contentions that the ALLL figures were false, Damian compares ALLL as a percentage of total loans throughout this period to the percentage of adversely classified loans in the loan portfolio, as evidenced by the Powell Reports, during this same period. Specifically, Damian notes that although ALLL was only

---

**10.** In Exhibit B to the Complaint, Damian indicates that Defendants falsely reported ALLL as of March 31, 2010 in their second

quarter 2010 report, but the Court assumes that she was actually referring to the first quarter 2010 report.

one to three percent of the portfolio, between twenty-eight and thirty-seven percent of the Bank's loan portfolio was classified with a risk rating of substandard or lower.

Defendants contend that Damian has failed to plead a misstatement of ALLL for several reasons, which fall into two main categories: (i) the statements regarding ALLL are not actionable because they are forward-looking statements protected by a safe harbor; and (ii) Damian does not allege sufficient facts to support the claim that the statements of ALLL were false or misleading.

### i. Forward–Looking Statements

■ Under the judicially-crafted "bespeaks caution doctrine" and the PSLRA's safe harbor for forward-looking statements, "forward-looking statements 'accompanied by meaningful cautionary statements' explaining the risks that may preclude a forward-looking projection from coming to fruition are immaterial as a matter of law." *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1266 (11th Cir. 2013).[11] Defendants argue that the disclosures of ALLL were rendered immaterial under the safe harbor because the PPM contained language cautioning that ALLL might be based on inaccurate assumptions, and material additions to ALLL would materially decrease MCB's net income.

■ As Defendants note, the PPM contains detailed cautionary language regarding ALLL. In the "risk factors" section of the PPM, MCB notes, "Our success depends to a significant extent upon the quality of our assets, particularly loans. The risk of loss varies with, among other things, general economic conditions, the type of loan being made, the creditworthiness of the borrower and the quality of the collateral for the loan." [58–1] at 17. The PPM also provides that MCB maintains "an allowance for loan losses in an attempt to cover any loan losses that may occur." The PPM lists some of the factors MCB used in its analysis to determine ALLL and warns, "Our determination of the size of the allowance could be understated due to our lack of familiarity with market-specific factors." *Id.* MCB goes on to explain:

> If our assumptions are wrong, our current allowance may not be sufficient to cover future loan losses, and adjustments may be necessary to allow for different economic conditions or adverse developments in our loan portfolio.... We expect to continue to increase our allowance in 2010; however, we can make no assurance that our allowance will be adequate to cover future loan losses given current and future market conditions. In addition, federal and state regulators periodically review our allowance for loan losses and may require us to increase our provision for loan losses or recognize further loan charge-offs, based on judgments different than those of our management.

*Id.* These statements specifically identify "important factors that could cause actual results to differ materially from those in the forward-looking statements." *In re S1 Corp. Sec. Litig.*, 173 F.Supp.2d 1334, 1352

---

**11.** The Court will use the term "safe harbor" to refer, interchangeably, to the PSLRA safe harbor and the bespeaks caution doctrine. *See Miyahira*, 715 F.3d at 1266 (noting that the PSLRA's safe harbor provision "is the statutory equivalent of the 'bespeaks caution doctrine' "). By its terms the PSLRA safe harbor applies only to forward-looking statements made by certain issuers, or persons acting on their behalf. *See* 15 U.S.C. § 78u–5(a). However, the parties do not raise the question of whether the PSLRA safe harbor applies to MCB's statements, and the Court need not examine this issue because the bespeaks caution doctrine may apply even if the safe harbor does not.

(N.D. Ga. 2001) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). Thus, the Court agrees with Defendants that if the statements of ALLL are forward-looking statements subject to the safe harbor, sufficient cautionary language accompanied the statements in the PPM and call reports regarding ALLL.[12]

However, this does not necessarily mean that the statements of ALLL are protected under the safe harbor. Damian contends that the ALLL statements were not "forward-looking statements" within the meaning of the safe harbor because they should have reflected the known condition of the Bank's loan portfolio. Defendants have not cited any case law that definitively establishes that statements of ALLL are forward-looking. In a prior case cited by Defendants, the Court referenced a litany of cautionary statements related to various allegations, including allegations regarding the sufficiency of the loan loss reserve model, but the Court did not need to conduct a detailed analysis of which statements were forward-looking and which were not. *See In re HomeBanc Corp. Sec. Litig.*, 706 F.Supp.2d 1336, 1353 (N.D. Ga. 2010) ("Although these disclosures may not immunize every statement that Plaintiff alleges to be false or misleading, they do as a whole erode the essential allegations of Plaintiff's complaint."). Further, the case that Defendants cite for the proposition that the ALLL disclosures are forward-looking, *Fait v. Regions Fin. Corp.*, 712 F.Supp.2d 117, 124 (S.D.N.Y. 2010), *aff'd*, 655 F.3d 105 (2d Cir. 2011), concludes not that the statements of loan loss reserves were forward-looking, but rather that they "reflect management's opinion as to the likelihood of future loan losses and their magnitude."

Nevertheless, *Fait* and other courts have held that because statements of ALLL or loan loss reserves are statements of opinion, the plaintiff must sufficiently allege that "defendants did not truly hold those opinions at the time they were made." *Id.*; *see also Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F.Supp.2d 1210, 1217–18 (N.D. Ga. 2012) (noting that because they are statements of opinion, the plaintiff "must sufficiently allege subjective falsity in its claims" regarding misstatements of ALLL). Thus, even assuming that the safe harbor does not apply, based on case law regarding statements of opinion, Damian must allege facts sufficient to show that Defendants

---

**12.** The Court notes that the cautionary language was included in the PPM, and at least one district court has concluded that cautionary language must be included in the same document as the alleged misstatements. *See In re Apple Computer, Inc., Sec. Litig.*, 243 F.Supp.2d 1012, 1024–25 (N.D. Cal. 2002). However, other courts, including the Northern District of Georgia, have concluded that cautionary language in one document may be sufficient to protect alleged misstatements in other documents as long as the two are related and close in proximity. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122–23 (10th Cir. 1997); *In re S1 Corp. Secs. Litig.*, 173 F.Supp.2d at 1356–57 (agreeing with the reasoning in *Grossman* and holding that forward-looking statements in press releases and public statements were protected by the safe harbor because the SEC registration statement contained sufficient cautionary language); *see also In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F.Supp.2d 1339, 1350–52 (N.D. Ga. 2010), *aff'd sub nom, Phillips v. Scientific–Atlanta, Inc.*, 489 Fed.Appx. 339 (11th Cir. 2012). The Court agrees with the later approach, and based on the circumstances of this case the Court concludes that if the statements are forward-looking statements subject to the safe harbor, the cautionary language in the PPM would extend to statements of ALLL in the quarterly call reports. The PPM was issued in April 2010, and the transaction between PFGBI and MCB closed less than eight months later. The PPM was the primary document marketing MCB's stock to investors, and it served as the frame of reference for MCB's review of subsequent numbers reported in the call reports.

knew the statements of ALLL were false when they were made.[13] This leads to the next question, one that is central to this case–whether Damian has alleged facts sufficient to plead a misstatement of ALLL.

### ii. Falsity of ALLL

Damian's allegations regarding the falsity of ALLL hinge on the comparison of two figures—the percentage of adversely classified loans in the loan portfolio and ALLL as a percentage of the loan portfolio. Damian asserts that, according to the Powell Reports, in December of 2007, 4.16% of the Bank's loans were classified as adverse. This percentage increased to 14.61% in December of 2008; 28.43% in September of 2009; and 33.83% in December 2009. In 2010, adversely rated loans constituted 28.28% of the Bank's loans in March and April 2010, 33.6% of the loans in May 2010, 36.39% of the loans in June 2010, 38.39% of the loans in July 2010 and 39.24% of the loans in October 2010.

■ Damian contends that this substantial increase in adversely classified loans was not reflected in the ALLL calculations for the same periods. In 2007, the ALLL averaged 1.3% of the Bank's loan portfolio, and in the PPM, the ALLL reported as of December 31, 2009 was a mere 1.2%. As of March 31, 2010, ALLL was 1.16%; as of June 30, 2010, it was 2.7%; and as of September 10, 2010, it was 2.6%. At first glance, Damian's comparison of ALLL to the percentage of adversely classified loans might appear persuasive. However, upon review of the PPM and the other materials on which Damian relies to support her allegations, the Court concludes that Damian has established neither subjective nor objective falsity of the ALLL figures.

First, the materials attached to the Complaint lead to the conclusion that com-

paring ALLL to adversely classified loans is like comparing apples to oranges. They are in the same food group, but they are not the same. Loans that have been assigned a negative credit risk rating are referred to as "adversely classified loans." Substandard, doubtful, and loss loans are all considered adversely classified loans, but they carry varying degrees of risk or expected collectability. According to the 2001 Comptroller's Handbook on Rating Credit Risk [58–5], "substandard" assets are "inadequately protected by the current sound worth and paying capacity of the obligor or of the collateral pledged, if any," and they "are characterized by the distinct *possibility* that the bank will sustain some loss if the deficiencies are not corrected." *Id.* at 19 (emphasis added). "Doubtful" assets have "weaknesses [that] make collection or liquidation in full ... *highly questionable and improbable*," and "loss" assets "are considered *uncollectible* and of such little value that their continuance as bankable assets is not warranted." *Id.* at 19–20.

According to the Interagency Policy Statement on the Allowance for Loan and Lease Losses [58–4] (the "Policy Statement"), published by the Federal Reserve Board Division of Banking Supervision and Regulation, "[a]n appropriate ALLL covers *estimated credit losses* on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio." *Id.* at 2 (emphasis added). The Policy Statement defines estimated credit losses as "an estimate of the current amount of loans that it is *probable* the institution will be unable to collect given facts and circumstances as of the evaluation date." *Id.* at 2–3. (emphasis added). The Policy Statement further explains,

---

**13.** The Court need not ultimately decide whether the safe harbor applies because, as

noted below, the Court concludes that Damian has failed to establish the falsity of ALLL.

"These estimated credit losses should meet the criteria for accrual of a loss contingency (i.e., through a provision to the ALLL) set forth in GAAP." *Id.* at 3. And according to the Policy Statement, GAAP

> requires the accrual of a loss contingency when information available prior to the issuance of the financial statements indicates it is *probable that an asset has been impaired at the date of the financial statements* and the amount of loss can be reasonably estimated. These conditions may be considered in relation to individual loans or in relation to groups of similar types of loans.... [A]n individual loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement.

*Id.* at 26, n.7 (emphasis added). In other words, ALLL is an estimate of *probable* credit losses that are inherent in the loan portfolio as of a given date.

Although risk ratings are relevant to the calculation of ALLL, Damian has not alleged any facts to show a direct correlation between the percentage of adversely classified loans and the ALLL. Damian notes that the Comptroller's Handbook states that "ALLL must be directly correlated with the level of risk indicated by risk ratings." [58–5] at 4. However, the handbook does not require banks to include the full value of *all* classified assets in the ALLL. The handbook explains that because of the "high probability of loss" associated with doubtful assets, "nonaccrual accounting treatment is required" for doubtful assets. *Id.* at 19. In contrast, such treatment is not required for all substandard assets. "Although substandard assets in the aggregate will have a distinct poten-

tial for loss, an individual asset's loss potential does not have to be distinct for the asset to be rated substandard." *Id.* Indeed, the Policy Statement makes clear that "under GAAP, the purpose of the ALLL is not to absorb all of the risk in the loan portfolio, but to cover probable credit losses that have already been incurred." [58–4] at 26, n.7. In other words, the Bank need not and should not assume that all of its substandard loans, which by definition are characterized by a potential for loss, at least in the aggregate, will eventually be written off.

Damian asserts that even though Defendants were not required to include the full value of substandard loans in ALLL, "Defendants ignored the key factor of known risk of non-payment" and failed to comply with the Comptroller's Handbook when computing ALLL. [58] at ¶¶ 35, 38. In other words, Damian appears to assert that Defendants did not consider the percentage of adversely classified loans at all when calculating ALLL. But Damian does not offer sufficient facts to show that Defendants did not take into account the risk of non-payment or the level of substandard and doubtful classified loans when calculating ALLL.

Damian attached to the Complaint the Powell Report for the second quarter of 2010 [58–3], which indicates that the vast majority of the Bank's adversely classified loans were classified as substandard, and as discussed above, substandard loans are not necessarily included dollar for dollar in the ALLL. As Defendants note, the Powell Reports are based on a review of a mere sampling of approximately ten to fifteen percent of the portfolio, and the reports do not calculate ALLL.[14] Further,

---

14. The Complaint alleges that Powell told Price after the closing of the transaction that PFGBI would have been better off purchasing a lottery ticket instead of purchasing the Bank for $10M. However, there is no indication that Powell ever made such a statement to Defendants.

Damian never points to specific calculations of what the ALLL should have been at a given time or even indicates what specific components should have gone into the Bank's ALLL calculations. She merely suggests that because the percentage of adversely rated loans was so high compared to previous periods and because the Bank eventually had to make more charge-offs, the ALLL must have been undervalued. The fact that the Bank had to make subsequent charge-offs is not sufficient to show that the ALLL was false. *See In re HomeBanc Corp. Sec. Litig.,* 706 F.Supp.2d at 1360 ("Plaintiff's reliance upon after-the-fact events (i.e., HomeBanc's ultimate demise) to support an inference that these and other earlier statements must have been intentionally misleading and made with scienter amounts to little more than fraud by hindsight, which is not actionable.")

Neither does the increase in the percentage of adversely classified loans between 2007 and 2009 demonstrate that the ALLL was false. Damian asserts that "while concentration of risky loans had increased by a factor of eight in the two years immediately preceding the time PFGBI was considering purchasing [MCB], Defendants represented to PFGBI (and anyone else thinking of buying [MCB]) that ALLL had actually decreased over the same period." [58], ¶ 46. As Defendants point out, Damian ignores at least one potentially significant factor that may impact ALLL-the fact that over $17 million in loans were charged off during 2009 alone. Charge-offs are not included in ALLL. In fact, the PPM warned potential investors that the relatively low

ALLL as of December 31, 2009 was net of significant charge-offs. The PPM states:

> As a result of the substantial charge-offs we made during the year ended December 31, 2009, our allowance for loan losses has decreased to approximately $1.9 million, or 1.2% of loans receivable at December 31, 2009, down from approximately $4.0 million or 2% of loans receivable as of December 31, 2008. Our allowance of approximately $1.9 million is net of our charge-offs of approximately $17.6 million during the twelve months ended December 31, 2009. We expect to continue to increase our allowance in 2010....

 at 17. The Policy Statement explains that "if declining credit quality trends relevant to the types of loans in an institution's portfolio are evident, the ALLL level as a percentage of the portfolio should generally increase, barring unusual charge-off activity." [58–4] at 6. Thus, the Policy Statement indicates that the significant charge-offs in 2009 would or, at the very least, could affect ALLL. And again, the Complaint offers no insight into what went into either the 2007 or the 2009 calculations.

Additionally, to the extent Damian claims that ALLL should have increased after the charge-offs in 2009, ALLL as a percentage of the loan portfolio *did* increase in the period leading up to the transaction. It more than doubled between December 2009 and June 2010, and this was in addition to continued charge-offs by the bank.[15] Thus, the suggestion that the increase in the percentage of adversely classified loans had no impact on MCB's financials is not supported by the facts incorporated into the Complaint.

---

15. To the extent the increase in ALLL in 2010 could be viewed as an indication that the December 2009 ALLL was incorrect, Defendants contend that the 2009 ALLL was outdated by the time PFGBI made its investment in December 2010. Damian does not seriously contest this but argues that it was the consistent falsity of the ALLL figures that made them misleading.

In short, Damian has failed to establish that the ALLL figures reported in the PPM and call reports were false or misleading. Further, even if the Court determined that the comparison of ALLL to the percentage of adversely classified loans sufficiently supported an allegation that the ALLL calculations were objectively false, Damian does not allege sufficient facts to show that Defendants *knew* they were false at the time they were reported. Damian asserts that Defendants actively concealed the Powell Reports and information on adversely classified loans, but as explained below she has not alleged sufficient facts to support this claim.

**b. Concealment of the Powell Reports**

■ Damian alleges that Defendants concealed the existence of the Powell Reports, which would have revealed the falsely stated loan value and ALLL. According to the Complaint, the PPM "nowhere mentions that the Bank had frequent periodic reports prepared by Powell ... that analyzed the risk in, and therefore the quality of, the Bank's loan portfolio." [58], ¶11. The Court respectfully disagrees.

In multiple locations, the PPM explains the impact of the October 2009 FDIC order and the steps the Bank was required to take to comply with that order. Each time, the PPM notes that the FDIC order required the Bank to "implement an effective system of grading and reviewing the Bank's loan portfolio." [16] [58–1] at 5, 23, 47. The PPM also refers to certain restrictions on the Bank in extending credit to borrowers that have been "charged-off or classified as 'loss,' 'doubtful' or 'substandard.'" *Id.*

The only specific fact that Damian alleges in support of her claim that Defendants concealed the Powell Reports from PFGBI is that PFGBI asked the individual Defendants to identify the Bank's auditors and provide copies of auditor reports, and only the bank's general auditor, Thigpen, Jones, Seaton & Co., P.C., was identified. Damian asserts that Powell is an "auditor" and therefore should have been referenced in Defendants' response to the request for information on auditors. However, the Powell Report attached to the Complaint is entitled a "loan review," not an audit report. Damian cites several cases that refer to similar loan reviews as "audits," but the fact that some courts have referred to loan reviews as audits does not mean that Defendants should have known that PFGBI was referring to the Powell Reports when it requested audit reports. There is no indication that Defendants were aware of this case law or that Defendants themselves referred to the Powell

16. During oral argument regarding the motions to dismiss, Defendants pointed the Court to a complaint filed by Damian against Nelson Mullins, *Damian v. Nelson Mullins Riley & Scarborough, L.L.P.*, case no. 1:14-cv-03498-TCB (N.D. Ga. Oct. 30, 2014), which contends, contrary to the Complaint, that Nelson Mullins should have known that the Powell Reports existed based on the October 2009 FDIC order. Defendants request that the Court take judicial notice of the complaint against Nelson Mullins and charge Damian with the knowledge of her attorneys. Although the Court appreciates Defendants' arguments, and agrees that Damian's position in the Complaint is irreconcilable with her position in the complaint against Nelson Mullins, the Court is hesitant to rely on this as a basis of dismissal. To charge Damian with the knowledge of her attorneys alleged in the Nelson Mullins complaint would be tantamount to applying judicial estoppel. And the Eleventh Circuit has indicated that judicial estoppel applies only if the inconsistent position was "made under oath in a prior proceeding," *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002), and here the inconsistent position was taken in a non-verified complaint in a subsequent proceeding that is in the early stages of adjudication. Thus, it is not clear that judicial estoppel is appropriate at this juncture, and as noted above, the Court concludes it is not necessary.

Reports as audit reports. As noted above, the PPM clearly indicated that the Bank was required to conduct regular reviews classifying the portfolio, and there is no indication that PFGBI ever explicitly asked to see these reviews. Damian simply has not alleged any facts to suggest that Defendants purposely concealed the Powell Reports from PFGBI.

Further, the Court is not convinced that Damian has sufficiently alleged that the omission of the reports was material. Section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S.Ct. 1309, 1321, 179 L.Ed.2d 398 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). Omitted information is material "when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 1318 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)) (internal quotation marks omitted). Damian's argument regarding the materiality of the Powell Reports hinges on her assertion that the reports reveal the falsity of ALLL, a contention that the Court has already addressed and rejected.

Additionally, even though the numbers in the Powell Report and the reports themselves were not provided to PFGBI, the fact of the Bank's deteriorating condition, including its deteriorating loan portfolio, was disclosed in numerous places in the PPM. In addition to the statements

noted above regarding net charge-offs and the FDIC order, the PPM states, "Declining real estate values in our market and declining housing prices led to increased charge-offs and delinquencies in our loan portfolio." [58–1] at 22. Regarding non-performing assets, the PPM states, "As of December 31, 2009, non-performing assets increased to approximately $49.5 million, including approximately $29.7 million in non-performing loans and approximately $19.8 million in other real estate owned," *id.* at 13, and "[n]on-performing assets represented 31.7% of total loans at December 31, 2009." *Id.* at 22. In fact, according to the PPM, MCB planned to use the proceeds from the sale of stock "to supplement [its] capital base" and provide "flexibility in addressing [its] nonperforming assets and ... the potential for continued deterioration in [its] loan portfolio." *Id.* at 7. Nothing in the call reports indicates that the situation improved after the issuance of the PPM. Instead, the call reports show that the Bank doubled ALLL and continued to charge off loans in 2010.

### c. Verbal Misrepresentations

The Complaint also alleges that in the spring and summer of 2010, Dorough and Robinson made certain verbal misstatements regarding the loan portfolio during meetings with Lee Price and PFGBI's largest investor, Dan McSwain. The Complaint includes various iterations of these statements,[17] but the common thread is that Dorough and Robinson indicated to Price and McSwain that the Bank's "riskiest loans" or "problem loans" had been converted into real estate through foreclosures, and therefore PFGBI should focus on the real estate assets. *See, e.g.*, [58] at ¶ 13, 47. As Defendants note, the fact that MCB had been converting bad loans into

---

17. Indeed, the Court has found it difficult to determine exactly how many separate statements Damian is alleging and to distinguish

between the statements themselves and the alleged implications of those statements.

owned real estate appears to be undisputed.

Further, to the extent that Dorough and Robinson indicated that PFGBI "need not pay for a loan-by-loan review of the Bank's loan portfolio," *id.* at ¶ 47, or that it should focus on the Bank's real estate, Damian has not alleged sufficient facts to suggest that Dorough and Robinson did not believe these statements at the time they were made. The Complaint acknowledges that there were problems with the real estate and that PFGBI expected to write down approximately one-third of the value of the real estate. [58] at ¶ 52. Ultimately, Damian's allegation that MCB misled Price and McSwain by indicating that they should focus on the real estate instead of the loans appears to be rooted in Damian's contention that Defendants were trying to conceal the Powell Reports to hide the falsity of ALLL, an assertion that the Court has already rejected. Again, Damian's contentions that the statements of Dorough and Price painted a false picture that there were no potential issues with the remaining loans in the bank's portfolio are contradicted by the subsequent call reports showing a doubling of ALLL and additional charge-offs.

### 2. Scienter

■ As noted above and in the November 8, 2013 order, with respect to her federal law claims, Damian must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The inference of scienter is "strong" when it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In other words the Court must ask, "When the allegations are accepted as true and taken collectively, would a rea-

sonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326, 127 S.Ct. 2499.

■ To satisfy the scienter element of her 10b–5 claims, Damian must prove that Defendants acted with either "intent to deceive, manipulate, or defraud" or "severe recklessness." *Mizzaro*, 544 F.3d at 1238 (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999)) (internal quotation marks omitted). She must allege facts that create a strong inference of scienter for each Defendant and each alleged violation of the statute. *Id.* To plead scienter with respect to MCB, Damian must allege facts that engender a strong inference "that *somebody* responsible for the allegedly misleading statements must have known about the fraud." *Id.* at 1254.

Here, Damian asserts that the three individual Defendants had specific duties and knowledge of the loan portfolio (and knowledge of or access to the Powell Reports), and they specifically misled PFGBI about the health of the bank's loan portfolio. The fact that the individual Defendants had access to the Powell Reports and a duty to review the information in them does not sufficiently establish scienter. *See In re Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F.Supp.2d 1187, 1201 (N.D. Ga. 2007) ("[I]t is not enough to make conclusory allegations that the Defendants had access to the true facts in order to demonstrate scienter, particularly where the complaint fails to allege which defendant knew what, how they knew it, or when." (internal citations and quotation marks omitted)). And as discussed above, Damian has simply failed to allege sufficient facts to support her conclusions that Defendants actively concealed the Powell Reports or discouraged PFGBI from looking into the status of the loan portfolio. Thus, even if the Court had concluded that Damian al-

leged a material misrepresentation or omission, the Court notes that Damian has not alleged facts that give rise to a strong inference that Defendants intentionally defrauded PFGBI or acted with "severe recklessness," as is required for a 10b–5 claim.

### 3. Justifiable Reliance

To prove her 10b–5 claims, Damian must show "justifiable reliance" on the material misstatement or omission. *See SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012). Justifiable reliance essentially means reasonable reliance. *See Ledford v. Peeples*, 657 F.3d 1222, 1248 n.80 (11th Cir. 2011). To prove justifiable reliance on the misrepresented or omitted information, Damian must show that PFGBI reasonably relied on the misrepresentations or omissions of Defendants and that PFGBI "still could not have discovered the truth behind the fraudulent omission or misrepresentation" even "with the exercise of reasonable diligence." *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1047 (11th Cir. 1987). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S.Ct. 2179, 2185, 180 L.Ed.2d 24 (2011).

Damian alleges that PFGBI relied on the alleged misstatements and omissions in its decision to purchase the securities and by re-stating the misstated ALLL in its correspondence and discussions with regulators. Damian further alleges that Lee Price's notes and his interview with Damian's counsel reflect that he relied heavily on Defendants' representations regarding the value of ALLL when he authorized PFGBI to purchase the controlling interest in MCB.

However, as Defendants note, the Complaint reveals that PFGBI and its representatives conducted over six months of due diligence. Through the PPM, they were, among other things, warned about deteriorating conditions of the real estate market; cautioned against relying on ALLL because it was subjective and might be undercalculated; and alerted that the Bank had recently charged off more than $17 million in loans. They were also expressly given the opportunity to ask for more information. During the period between the issuance of the PPM and the closing of the transaction, the Bank continued to publicly file call reports that showed its charge-offs and ALLL.

Although Defendants' arguments are well-taken, as the Court has previously noted, the question of reasonable reliance is typically a fact question, and therefore failure to sufficiently plead reliance is rarely a basis for dismissing a claim. Ultimately, the Court need not decide whether Damian has pled reasonable reliance on Defendants' alleged misstatements or omissions because the Court has determined that Damian has failed to sufficiently plead a material misstatement or omission.

### 4. Loss Causation

To establish loss causation, Damian must show a link between Defendants' alleged misstatements or omissions and her economic loss; she must show that the acts or omissions of Defendants proximately caused her injury. *See Dura Pharm.*, 544 U.S. at 340, 125 S.Ct. 1627; *see also* 15 U.S.C. § 78u–4(b)(4) (requiring proof that the misrepresentation "caused the loss for which the plaintiff seeks to recover"). To meet this requirement, Damian must allege that the share price of the security at issue "fell significantly after the truth became known," *Dura Pharm.*, 544 U.S. at 347, 125 S.Ct. 1627, or that

Defendants' misstatements concealed a foreseeable risk that ultimately materialized and "negatively affected the value of the security," *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Damian is not required to allege that Defendants' misstatements and omissions were the "sole and exclusive cause" of her damages; but she must allege that Defendants' conduct was a "substantial" or "significant contributing cause." *FindWhat Investor Grp.*, 658 F.3d at 1309 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)) (internal quotation marks omitted). Thus,

> even if a defendant's misconduct induces the plaintiff to make the investment, if the plaintiff's loss is caused by supervening general market forces or other factors unrelated to the defendant's misconduct that operated to reduce the value of the plaintiff's securities, the plaintiff is precluded from recovery under Rule 10b–5.

*Patel v. Patel*, 761 F.Supp.2d 1375, 1381 (N.D. Ga. 2011). The Court must dismiss the Complaint if it provides no facts that distinguish "between losses caused by the defendants' alleged misrepresentations and the intervening events that wreaked havoc on the banking industry as a whole." *Id.*

█ Although Damian has added much to her complaint, she has done little to cure the deficiencies in pleading loss causation that the Court recognized in its prior order. Damian asserts that if PFGBI representatives had known about the Powell Reports, they would not have purchased MCB's stock, which was essentially worthless. However, Damian has not shown that the stock was worthless at the time of purchase, and Damian has not alleged facts that would allow the Court to distinguish between losses caused by the alleged misrepresentations and omissions and losses caused by other intervening events, such as the fraud of Lee Price or

the general deterioration of the financial markets during this time. Regarding Price's fraud, Damian alleges that "practically all of the funds that were raised by the Receivership Entities from its investors were not stolen by Lee Price. Those funds were mostly lost by Lee Price with his highly risky day trading. Lee Price's risky investing increased dramatically *after* PFGBI's funds went to the Company." [58] at ¶ 68. Even if true, these allegations do not address the potential impact that Price's later "risky day trading" or fraud had on the Bank or MCB in the eighteen months after PFGBI purchased the Bank. And Damian alleges no facts to address the impact of market forces in general, including those forces at work in the local real estate markets, which MCB discussed in the PPM. As noted above, the fact that PFGBI would not have purchased the securities absent the alleged misrepresentations or omissions does not establish loss causation if the actual loss was caused by "supervening general market forces or other factors unrelated to the defendant's [alleged] misconduct." *See Patel*, 761 F.Supp.2d at 1381.

In sum, Damian has failed to sufficiently plead a material misstatement or omission, a strong inference of scienter, or loss causation. As a result, the Court must dismiss her claim under § 10(b) and Rule 10b–5 against MCB.

## B. Secondary Liability Under § 20(a)

█ Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall ... be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Thus, a primary violation of the securities laws is an essential element of a § 20(a) claim for derivative liability. *Rosenberg v. Gould*,

554 F.3d 962, 967 (11th Cir. 2009). Because Damian has failed to sufficiently allege her Section 10(b) and Rule 10b–5 claim against MCB, her federal claims against the individual Defendants must also fail.

## C. State Law Claims

The elements of common law fraud and negligent misrepresentation under Georgia law are essentially the same as the elements of a 10b–5 claim, except for the level of scienter required to prove negligent misrepresentation. *See Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 758 n.25 (11th Cir. 1984) (noting the elements of common law fraud in Georgia); *Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.*, 117 F.Supp.2d 1357, 1360 (N.D. Ga. 2000) (noting the elements of common law fraud and negligent misrepresentation). As noted above, to proceed with her state law claims, Damian is not required to allege scienter (or negligence) with the level of particularity required by the PSLRA. However, she is required to meet the heightened pleading standard under Rule 9(b) for the alleged misstatements or omissions and the general pleading standard for loss causation. For the reasons explained above, the Court determines that Damian's state-law claims for common law fraud and negligent misrepresentation should be dismissed based on her failure to sufficiently plead a material misstatement or omission and her failure to plead loss causation.

██ Damian also brings, in the alternative, a claim against Defendants for aiding and abetting Aubrey Lee Price's breach of fiduciary duty to PFGBI and the other Receivership Entities. To recover for this claim, Damian must prove:

(1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga.App. 587, 726 S.E.2d 779, 788 (2012) (quoting *Insight Tech., Inc. v. FreightCheck, LLC*, 280 Ga.App. 19,633 S.E.2d 373, 379 (2006)). Aside from the conclusory assertion that Defendants aided Price in his breach of fiduciary duty, the Complaint does not allege that Price breached his fiduciary duty in the context of the transaction with PFGBI.[18] To the contrary, the Complaint alleges that Defendants defrauded Price and PFGBI, and actively concealed information from him. Thus, the Court concludes that Damian's aiding and abetting claim must fail.

## IV. Conclusion

For the foregoing reasons, the Defendants' motions to dismiss for failure to state a claim [59, 60] are granted. Damian's complaint is hereby dismissed with prejudice.

IT IS SO ORDERED this 31st day of March, 2015.

---

**18.** The Court does not doubt that Aubrey Lee Price breached his fiduciary duty to investors when he committed fraud, but the issue in this instance is whether Damian has alleged in the Complaint that Price breached his fiduciary duty in connection with the PFGBI transaction.