RICHARD W. STORY, United States District Judge
The captioned case is before the court for consideration of defendants' motion to dismiss [22].
I. Factual Background[1]
Blue Earth, Inc. was a clean-energy startup formed in 2010 ("Blue Earth" or the "Company"). (Compl. ¶ 2.) Blue Earth provided comprehensive energy efficiency and alternative/renewable energy solutions for small and medium-sized commercial and industrial facilities. (Ex. 2 at 4.) Defendant Johnny Thomas ("Thomas")
*1338 joined Blue Earth as its Chief Executive Officer ("CEO") on September 1, 2010 and served in that position until September 1, 2015, when he resigned to serve as CEO of a Blue Earth subsidiary. (Compl. ¶ 6.) Thomas also served as president of Blue Earth from September 1, 2010, until May 16, 2013. He was appointed to Blue Earth's Board of Directors in February 2011, a position in which he served until September 1, 2015. (Id. ) Defendant John C. Francis ("Francis") joined Blue Earth as its Executive Vice President of Corporate Development and Investor Relations on September 1, 2010, and served in that position until September 1, 2015. (Id. at ¶ 7.) Plaintiff Jackson Investment Group, LLC ("Jackson") is a private investment firm that invested in Blue Earth. (Id. at ¶ 3.)
In the first quarter of 2013, Blue Earth had a net loss of over $1.8 million. (Ex. A at 3.) In its quarterly report on Form 10-Q for the period ending March 31, 2013, Blue Earth explained that it had "not yet established an ongoing source of revenues sufficient to cover its operating costs and allow it to continue as a going concern" and that its survival depended on "obtaining adequate capital to fund operating losses until it becomes profitable." (Id. at 7 n.2.) Blue Earth warned that "[i]f the Company is unable to obtain adequate capital, it could be forced to cease operations." (Id. )
In July 2013, Blue Earth acquired IPS Engineering Inc. ("IPS") and Global Renewable Energy Group, Inc. ("GREG"). This was Blue Earth's first foray into the combined heat and power ("CHP") business.[2] (Id. at 15.) In announcing the acquisition, Blue Earth stated:
IPS is an EPCM company (engineering, procurement, construction and management) and GREG is an affiliated renewable energy company, which companies specialize in the combined heat and power ("CHP") alternative energy space. The Acquisitions will enable the Company to become a significant independent power producer ("IPP"). The Company plans to build seven power plants and sell the thermal and electric power generated to one large customer and to local utilities through long-term power purchase agreements. The Company is funding permitting and remaining development tasks for the initial projects from a portion of the proceeds of a recent private placement, while finalizing project financing terms for the estimated total construction costs of the seven plants of over $120 million. Management anticipates that the projects will be financed primarily through project debt, which will allow the Company to maintain ownership of the projects without significant share issuances. Blue Earth is continuing to perform engineering tasks on additional power plants for the same customer, in anticipation of adding several more construction projects.
(Ex. 3 at 2.) Blue Earth also hired two founders of IPS, Robert Potts ("Potts") and Brett Woodard ("Woodard"). (Ex. 4 at 2.) Blue Earth named Potts as its COO and Woodard as its CFO. (Id. ) Woodard was responsible for overseeing "financial analysis of acquisition, merger, and divestiture activities." (Ex. 5 at 14.)
Following the acquisition, Blue Earth added Michael Allman ("Allman") and James Kelly ("Kelly") to its Board of Directors and its audit committee. Allman was appointed chair of the audit committee and served as its "financial expert." He *1339 had experience as a CEO and CFO of various renewable energy companies and was certified both as a management accountant and internal auditor. Kelly had "knowledge and experience in accounting, management and the energy industry" and "exclusive responsibility for multiple external audits and management reviews of energy company operations." (Ex. 6 at 5.)
In its quarterly and annual financial statements filed pursuant to the requirements of the Securities and Exchange Commission (the "SEC"), Blue Earth disclosed its newly acquired CHP business. In its quarterly report on Form 10-Q for the period ending September 30, 2013 (first filing covering the period after the acquisition of the CHP business), which was filed on November 15, 2013, Blue Earth explained that "the cost of the assets acquired [were] capitalized and allocated to the several projects to be constructed" as "Construction in progress." (Ex. 7 at 11.) Blue Earth explained in its annual report on Form 10-K for the period ending December 31, 2013, which was filed on March 3, 2014, that the assets accounted for as "Construction in progress" were "[d]esigns for co-generation projects." (Ex. 2 at F-21.) The Form 10-K stated that the IPS purchase consisted of 15.5 million shares at $2.84 per share for a total of $44,035,500, resulting "in a construction in progress asset of $44,029,229." (Id. at F-27.)
On April 2, 2014, the SEC sent a letter to Blue Earth asking for details about Blue Earth's decision to account for the projects as "Construction in progress" in Form 10-K. (Ex. 11 at 3.) More specifically, the SEC asked:
We note that you disclose your construction in progress represents designs for cogeneration projects. To help us understand whether the assets represent physical assets in construction or an intangible asset related to contract rights, please tell us in sufficient detail about the nature of the underlying assets. Also tell us the estimated costs to complete the seven co-generation projects, the expected source of funds for the projects, the current status of each project, and the estimated timing of beginning and ending each project.
(Id. ) In response, on April 11, 2014, Thomas explained:
The underlying assets for the purchase of IPS/GREG are the designs and plans created by IPS/GREG to use natural gas to generate steam to power electrical generators in meat processing plants. The steam is secondarily used to butcher and process the meat. There were no contract rights existing beyond the right to build the plants at the time of the purchase of IPS/GREG. The Company is negotiating the purchase take off agreements with the local utilities for the excess electricity which they are required by law (PURPA) to accept at their avoided cost rate.
....
The first project is on schedule to be turned on line in August 2014 with 4 more in the fourth quarter of 2014 and the remaining 2 in the first quarter of 2015. All of the projects have begun preconstruction work including siting and permitting as of this date. Equipment has been ordered and is being built for the first 5 projects. During ... the fourth quarter of 2013, the Company raised approximately $12 million (including $1,600,000 payable through promissory notes) in equity capital through the exercise of approximately four million registered Class A warrants at $3 per share. The primary use of the capital raise[d] will be to provide the equity component of project financing for the seven initial combined heat and power projects. The Company has non-binding *1340 term sheets from an international bank and mezzanine debt providers that would result in approximately 8% equity and 92% project finance debt for the larger CHP power plants. The Company is negotiating with alternative financing services for various combinations of equity and debt project financing. To date, the Company is using cash on hand to advance the projects on schedule while deciding which of the various alternative sources of funding to use.
(Ex. 12 at 5.)
On April 23, 2014, the SEC sent another letter requesting the following:
Given the significance of these assets, please amend to disclose the nature of the assets similar to your response [dated April 11, 2014]. Further, with a view towards disclosure, please summarize the significant terms of the agreements you acquired. Based on your response, it appears that you acquired contracts to construct seven gas-to-steam generator facilities at certain meat processing plants in the U.S. and Canada. Also, revise your discussion of liquidity and capital resources in MD&A to provide disclosure similar to your response with respect to the estimated costs to complete the seven co-generation projects, the expected source of funds for the projects, the current status of each project, and the estimated timing of beginning and ending each project.
(Ex. 13 at 3.) In response, on May 12, 2014, Blue Earth amended its Form 10-K to include the following:
Our business model is to construct and own, on a customer's site under a long term lease, CHP or cogeneration systems, selling the thermal power to the customer and the electricity to the customer and the utility grid under long term power purchase agreements (PPAs). We have targeted large companies within the food-processing sector. To date, the Company has signed a letter of intent with a large U.S. and international protein provider to design, build and operate seven (7) CHP plants. We have invested significant revenues into the feasibility and permitting of these projects, have designed and ordered equipment for these projects and are negotiating and finalizing the various operating contracts. The PPA agreements with our customers will be on a take or pay basis at a guaranteed discount rate from what they currently pay to their local utility providers. To date, Blue Earth CHP has received limited revenue from engineering work done for a large food processor. Revenues from the sale of electricity generated, which is the foundation of this business unit, are expected to commence in the third quarter of 2014, when the first power plant is scheduled to be completed. The Company raised adequate equity to build this first power plant through its $12 million warrant exercise in November of 2013. In December 2013, the Company ordered generators, costing approximately $6.1 million for two power plants for which the total cost is expected to be approximately $17 million. The Company is making the equipment installment payments and construction costs from cash on hand, while selecting among several project debt financing options. The Company will install, own and operate the systems at two food-processing facilities selling thermal and electric power to the customer and the local utility under 20 year power purchase agreements, none of which have been signed. The units are modular, so construction is primarily assembly that is expected to be completed with power revenues commencing in or about August of 2014. In March 2014, the Company ordered generators costing approximately $17.6 million for three power plants, for which *1341 the total cost is expected to be approximately $67 million. These facilities are expected to be operational in the fourth quarter of 2014. Although these are the Company's first CHP power plants, Blue Earth team members have extensive experience building many larger, more complex CHP power plants with prior employers. The Company also employs large engineering companies for selected engineering and procurement activities as budgeted and planned.
(Ex. 14 at 6.) Blue Earth did not change the characterization of the CHP assets as "Construction in progress." (Id. at F-3.) In addition, as in the previous reports, the amended Form 10-K explained that the $44 million represented the value of "designs for co-generation projects" and "the costs accumulated on 7 gas to steam/electricity co-generation projects in the United States and Canada." (Id. at F-21.)
In a prospectus filed on May 14, 2014, Blue Earth reiterated the status of the CHP plants at that time, including the following:
To date, the Company has signed a letter of intent with a large U.S. and international protein provider to design, build and operate seven (7) CHP plants .... We have continued to negotiate these operating contracts while all of the foregoing work has been carried out and expect to enter into the initial contracts in the near term ..... The Company will install, own and operate the systems at two food-processing facilities selling thermal and electric power to the customer and the local utility under 20 year power purchase agreements, none of which have been signed. The units are modular, so construction is primarily assembly that is expected to be completed with power revenues commencing in or about August of 2014 .... In the event that the Company is unable to reach a definitive agreement with the intended customer or the customer is otherwise unable to commence commercial operations, the CHP equipment purchased is generic to virtually all CHP projects; the design work is usable for other potential customers and only a small amount of expenditures is site specific and would be written off ....
The purpose of the Company's acquisition of IPS Engineering Inc. (IPS) and Global Renewable Energy Group Inc.(GREG) was to acquire the plans and development of the above described CHP projects. As a result of this acquisition, the percentage of the Company's total assets represented by construction in progress assets of $44,029,229 at December 31, 2013, was approximately 51%. The Company recognized revenues of $11,444 and a net loss of $319,931 for the year ended December 31, 2013 from IPS and GREG.
(Ex. 15 at 4-5.)
In its quarterly report on Form 10-Q for the period ending March 31, 2014, which was filed on May 16, 2014, Blue Earth changed its characterization of the CHP assets from "Construction in progress" to "Property & equipment." (Ex. 8 at 3.) In its Form 10-Q's balance sheet, the bulk ($32,769,573 of $34,761,615) of the "Property & equipment" line item was allocated to "Cogeneration plants (under construction)." (Id. at 11.) The balance sheet listed that Blue Earth had a total of $88,192,692 in assets, that $33,745,418 of those assets-or 38% of all assets-were "Property and equipment, net," and that another $12,581,570 of the assets-or 14% of all assets-were "Construction in progress." (Id. ) It also explained that "[d]epreciation of the cogeneration plants will commence when the plants are placed in service during the latter part of 2014 and early 2015." (Id. ) The report further explained: "Although the Company has a limited operating history and limited revenues in comparison *1342 to the size of the projects it has undertaken, as a result of the Company's acquisitions, it is fully staffed with experienced personnel who have previously built many larger complex power plants. Our first CHP plant is expected to be completed in August 2014 with power revenues commencing thereafter." (Id. at 13.)
In June 2014, an investment-management consultant approached Jackson about investing in Blue Earth. (Compl. ¶ 16.) The consultant assembled presentation materials on Blue Earth's business plans and finances, which included information from Blue Earth's consolidated balance sheet in Blue Earth's Form 10-Q for the first quarter of 2014. (Id. ) Based on the Form 10-Q's balance sheet, the presentation stated that Blue Earth had a total of $88,192,692 in assets, that $33,745,418 of those assets-or 38% of all assets-were "Property and equipment, net," and that another $12,581,570 of the assets-or 14% of all assets-were "Construction in progress." (Id. ) Based on the presentation, Jackson believed that Blue Earth had over $33 million in tangible revenue generating assets and over $12.5 million more actually under construction. (Id. at ¶ 22.) On June 20, 2014, Jackson bought $2.5 million in Blue Earth stock. (Id. )
In its quarterly report on Form 10-Q for the period ending June 30, 2014, which was filed on August 14, 2014, Blue Earth characterized all of the CHP assets as "Property & equipment." (Ex. 9 at 3.) In its Form 10-Q's balance sheet, the bulk ($46,658,436 of $48,694,732) of the "Property & equipment" line item was allocated to "Cogeneration plants (under construction)." (Id. at 11.) The balance sheet reflected that Blue Earth had a total of $88,615,910 in assets and that $47,653,535 of those assets-or 53% of all assets-were "Property and equipment, net." (Id. ) It also explained that "[d]epreciation of the cogeneration plants will commence when the plants are placed in service during the latter part of 2014 and early 2015." (Id. ) The report further explained: "Although the Company has a limited operating history and limited revenues in comparison to the size of the projects it has undertaken, as a result of the Company's acquisitions, it is fully staffed with experienced personnel who have previously built many larger complex power plants. Our first CHP plant is expected to be completed in September 2014 with power revenues commencing thereafter." (Id. at 14.)
On August 28, 2014, Blue Earth announced the first executed CHP agreement to "design, build, finance, own and operate a $29 million ... co-generation power facility" in Alberta, Canada. (Ex. 16, Attach. 99.1 at 1.) Starting in early September 2014, Jackson directly exchanged emails with Thomas and Francis. (Compl. ¶ 23.) Neither Thomas nor Francis disclosed that the "Property & equipment" asset on the balance sheet solely consisted of the non-binding term sheets to discuss the possibility of building seven cogeneration plants. (Id. ) Nor did they explain how they and Blue Earth had calculated the valuation. Jackson continued to believe, incorrectly, that Blue Earth had tens of millions of dollars in tangible, revenue-generating property and equipment and had even more on the way. Jackson therefore invested another $4,017,095 through November 14, 2014. (Id. at ¶¶ 27-28.) On November 14, 2014, Blue Earth filed Form 10-Q for the period ending September 30, 2014. (Id. at ¶ 31.) On the balance sheet, at least $44,035,000 of the $52,248,308 labeled as "Property and equipment" represented the CHP assets. (Id. )
Days later, Thomas and Francis met with Jackson's senior representatives to solicit an additional investment. (Id. at ¶ 34.) During the meeting, defendants stated that Blue Earth had real, tangible assets.
*1343 (Id. ) Because Jackson continued to believe that Blue Earth had tens of millions of dollars of tangible, revenue-generating "Property & equipment," on November 25, 2014, Jackson made another $10 million equity investment in Blue Earth. (Id. at ¶ 38.) Jackson did so through a Common Stock Purchase agreement with Blue Earth that Thomas signed and that certified the accuracy of Blue Earth's SEC filings. That agreement also stated that Jackson was "relying on the representations, acknowledgments and agreements made by" Thomas in the agreement. (Id. at ¶ 39.) On December 3, 2014, Blue Earth announced work on the second CHP project, a $5.3 million CHP plant in Sumter, South Carolina, which it expected to be completed in the first quarter of 2015 (the "Sumter Plant"). (Ex. 17, Attach. 99.1 at 1.)
On or about February 18, 2015, a key potential investor in Blue Earth suddenly changed the terms by which that investor would make the investment. (Compl. ¶ 131.) The new terms were "very unacceptable," according to a memorandum Thomas sent to Jackson, copying Francis. (Id. ) Thomas wrote that the sudden breakdown of that potential investment placed Blue Earth in a "vulnerable" and "precarious" position and that Blue Earth "urgent[ly]" needed money to pay key vendors to continue construction on a cogeneration plant. Thomas added that the "timelines required to meet the urgent needs" "clearly limit[ed Blue Earth's] options" in finding an alternative investment. (Id. ). Thomas also said that finding "an investor or investment group that can/will step into the place of the" prior potential investor was "[c]learly ... in the best interest of" Blue Earth and that a cogeneration plant Blue Earth was building would serve as collateral for Jackson's "investment." (Id. at ¶¶ 40, 41.) Thomas and Francis called, emailed and met with senior Jackson personnel to solicit an investment and to press the case. (Id. at ¶ 40.) Thomas and Francis emailed to Jackson Blue Earth's budgets for 2015-2017, which included a balance sheet that stated that Blue Earth had over $56 million in "Net Fixed Assets" out of over $98 million total assets. (Id. at ¶ 42.) In addition, Thomas and Francis told Jackson that they had lined up another source of "take-out financing" that would quickly repay any new Jackson investment. (Id. at ¶ 49.) On March 3, 2015, Blue Earth filed its annual report on Form 10-K for the period ending December 31, 2014, which explained that "[d]uring 2014 the Company commenced construction of the [CHP] projects accordingly the costs were reclassified to Property & equipment." (Ex. 10 at F-25.)
On March 10, 2015, Jackson and Blue Earth signed a Note and Warrant Purchase Agreement, which Thomas signed on behalf of Blue Earth (the "March Note"). (Id. at ¶ 50; Ex. 23.) Under the agreement, Jackson paid Blue Earth $10 million for a 12% senior secured convertible note from Blue Earth, principal and interest of which were convertible to Blue Earth common stock at $1.00 per share; a warrant to purchase 2,000,000 shares of Blue Earth common stock at $1.00 per share; and the option to purchase up to 10,000,000 shares of Blue Earth common stock at $1.00 per share. (The conversion price and warrant and option exercise prices were later changed to $1.02 per share.) (Compl. ¶ 50.) Additionally, under the agreement, Blue Earth issued 200,000 shares of Blue Earth stock to Jackson as a "closing commitment fee." The note had a maturity of six months due to Thomas's and Francis's representation that take-out financing was lined up. (Id. ) The agreement incorporated by reference Blue Earth's SEC filings and contained representations that the filings were prepared in compliance with Generally Accepted Accounting Principles *1344 ("GAAP"). (Id. at ¶ 51.) In a press release, Thomas described the deal as an "investment" to fund plant construction and to provide working capital. (Id. at ¶ 53.) Under the terms of the March Note, the loan was secured by substantially all of Blue Earth's assets. (Ex. 23 at 2.) In addition, Blue Earth was required to obtain Jackson's consent to any future equity fundraising. (Ex. 23, Attach. 10.1 § 8.15.)
On April 1, 2015, Blue Earth announced completion of the Sumter Plant. (Ex. 18, Attach. 99.1 at 1.) On September 1, 2015, Thomas and Francis resigned their positions at Blue Earth to run EnSite Power, Inc., Blue Earth's subsidiary that focused on battery backup technology. (Ex. 19 at 2). Robert Powell ("Powell") succeeded Thomas as CEO. (Id. ) Powell had worked at SunEdison, Inc., the world's largest renewable energy development company, had been CFO of both NRG Renew and Pacific Gas & Electric Company, and was a partner at Arthur Andersen LLP. (Id. )
In September 2015, after defendants had resigned from Blue Earth, and Blue Earth failed to repay the March Note, Jackson and Blue Earth agreed to refinance the March Note through a 15% senior secured note for $10.6 million (the "September Note"). (Compl. ¶ 70; Ex. 24, Attach. 10.2.) Powell signed the September Note on behalf of Blue Earth. (Ex. 24, Attach. 10.2 at 13.) In the agreement, Blue Earth represented that the earlier 10-K and 10-Q were accurate and GAAP compliant. (Compl. ¶ 71.) Blue Earth used the proceeds to pay the March Note in full. (Ex. 24 at 2.) The terms of the March and September Notes provided that "No oral or written representations have been made other than as stated in this Agreement or in a Transaction Document." (Ex. 23, Attach. 10.1 § 6.8.)
On October 13, 2015, defendants again emailed Jackson a copy of a proforma balance sheet that repeated that Blue Earth had millions of dollars in "Property & equipment." (Compl. ¶ 75.) Later that month, Jackson invested $4,940,000 in return for a 9% senior secured note, relying on the "Property & equipment" and "take-out-financing" representation. (the "October Note"). (Id. at ¶¶ 78, 80.) It was due in December 2015, with principal and interest totaling $5,154,508. (Id. at ¶ 78.) The proceeds were to buy back shares of Blue Earth that the Company had sold to investors only a week before. (Ex. 25 at 2.) Powell signed the October Note. (Ex. 25, Attach. 10.1 at 13.)
In December 2015, when Blue Earth was unable to pay back the October Note, Jackson completed another note purchase that refinanced the October Note and included an additional $2 million investment from Jackson that would provide "working capital" (the "December Note"). Jackson received 704,842 shares of Blue Earth stock and a warrant to purchase additional shares. (Compl. ¶¶ 81, 83.) Powell signed the December Note on behalf of Blue Earth. (Ex. 26, Attach. 10.1 at 13.) The no-reliance provisions contained in the September Note also applied to the October and December Notes. (Compl. ¶¶ 79, 84.)
On March 1, 2016, after Blue Earth failed to make the scheduled payments, Jackson sent Blue Earth a notice of default. (Id. at ¶ 88.) This prompted Blue Earth to announce that it would seek to restructure under the Federal bankruptcy laws. (Ex. 27 at 2.) Blue Earth filed for Chapter 11 reorganization a few weeks later. Powell's declaration submitted with the petition stated that the purpose of the filing was to initiate a "debt-for-equity swap" with Jackson. (Ex. 28 ¶ 26.) The restructuring plan converted Jackson's debt into equity and made Jackson the sole shareholder of the reorganized company. Thus, once the restructuring plan was approved by the bankruptcy court, Jackson *1345 owned all of Blue Earth's assets. (Ex. 29, Attach. A at 32.) Rick Jackson, the principal of Jackson, was named sole director of the new entity, Brightmark Energy ("Brightmark"). (Id. , Attach. A at 38.) Jackson kept Powell as CEO and retained Potts as a consultant to the new entity. (Id. , Attach. E at 1; Ex. 20 at 4.) Additionally, Jackson pledged an initial equity and debt commitment of up to $250 million to Brightmark. (Ex. 1 at 1.)
On November 28, 2016, Jackson filed this lawsuit claiming that each of the defendants violated Section 10(b) of the Exchange Act ("Section 10(b)"), Rule 10b-5 promulgated thereunder ("Rule 10b-5"), and various state laws. Plaintiff further claims that the individual defendants are "controlling persons" of Blue Earth as defined by Section 20(a) of the Exchange Act ("Section 20(a)"), and are therefore individually liable for Blue Earth's alleged violations of Section 10(b) and Rule 10b-5. The core allegation is that Thomas and Francis incorrectly accounted for Blue Earth's CHP assets incorrectly as "Property & equipment" in its financial statements between May 2014 and December 2015. Plaintiff also alleges that in February 2015, Thomas and Francis falsely represented that Blue Earth had "lined up take-out financing" for Jackson's loans. Plaintiff contends that because Blue Earth did not in fact have $44 million in tangible property and equipment, Blue Earth had few assets Jackson could foreclose upon to recover its investments in the bankruptcy. Jackson states that its equity investments were wiped out and that it recovered only a fraction of its debt investments, resulting in a $20 million deficiency. (Compl. ¶¶ 92, 93.)
II. Legal Analysis
Defendants move to dismiss plaintiff's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for failure to plead fraud with particularity under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint's factual allegations are assumed true and construed in the light most favorable to the plaintiff. Hardy v. Regions Mortgage, Inc. , 449 F.3d 1357, 1359 (11th Cir. 2006) ; M.T.V. v. DeKalb County Sch. Dist. , 446 F.3d 1153, 1156 (11th Cir. 2006). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted). See also Fin. Sec. Assurance, Inc. v. Stephens, Inc. , 500 F.3d 1276, 1282-83 (11th Cir. 2007) (though notice pleading does not require specific facts to be pled for every element of a claim or that claims be pled with precision, "it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory' ") (citations omitted). "Broad Conclusory allegations are inadequate even under the liberal pleading rules of the Fed. R. Civ. P." Williams v. Lear Operations Corp. , 73 F.Supp.2d 1377, 1380-81 (N.D. Ga. 1999).
In addition, to survive a motion to dismiss, allegations of securities fraud must satisfy the requirements of Federal Rule of Civil Procedure 9(b). That rule provides, in relevant part, that "[t]he circumstances constituting fraud ... shall be stated with particularity." Fed. R. Civ. P. 9(b). To provide a sufficient level of factual support for a claim of securities fraud, a plaintiff must plead the circumstances of *1346 fraud in detail, including "[t]he who, what, when, where, and how." In re World Access, Inc. Sec. Litig. , 119 F.Supp.2d 1348, 1353 (N.D. Ga. 2000). The PSLRA added several additional pleading requirements to claims arising under the Exchange Act. The PSLRA provides that in any private action premised on an untrue statement or omission of material fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).
Moreover, "the PSLRA raised the standard for pleading scienter." Mizzaro v. Home Depot, Inc. , 544 F.3d 1230, 1238 (11th Cir. 2008). Specifically, in any securities fraud action "in which plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at § 78u-4(b)(2). To survive a motion to dismiss in the Eleventh Circuit, the complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." Mizzaro v. Home Depot, Inc. , 544 F.3d 1230, 1238 (11th Cir. 2008) (internal quotation omitted).
Defendants assert that the complaint must be dismissed because plaintiff has failed to plead falsity with particularity. To state a Section 10(b) claim, plaintiff must allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.' " Id. at 1236-37 (internal citation omitted). Plaintiff alleges that Blue Earth made false and misleading statements by classifying CHP assets as "Construction in progress" and "Property & equipment" in its 2014 and 2015 financial statements. Plaintiff alleges that defendants manipulated the accounting for the acquisition of the CHP assets to make it appear that Blue Earth had acquired sizeable real assets that could spur growth and that they treated the aspirational plans as a discrete asset on Blue Earth's Form 10-Q balance sheet by calling it "Construction in progress" implying that Blue Earth was building productive assets. (Ex. 7 at 3; Compl. ¶ 18.) On that balance sheet, defendants valued the "Construction in progress" at $44 million (over 56% of Blue Earth's total assets) and internally valued each potential plant at $6.3 million. (Compl. ¶ 18(a), (c).) The $44 million figure was the full value of the stock Blue Earth had issued in the IPS/GREG acquisition, which was disclosed in a note. (Ex. 7 at 11 n. 5.)
Plaintiff alleges that defendants' accounting for Blue Earth's acquisition of IPS and GREG and the construction "plans" violated Generally Accepted Accounting Principles ("GAAP"), Under GAAP, an acquirer records as "goodwill" the fair value of the consideration it pays for an acquiree, except that the acquirer may record a separate value for any separately "identifiable assets" acquired. FASB ASC 805-30-1, 805-20-25-1. An asset is separately "identifiable" only if (1) it is "separable" and thus "capable of being sold, transferred, licensed, rented or exchanged," or (2) it "arises from a contractual or other legal rights." FASB ASC 805-10-20. Under those GAAP rules, plaintiff *1347 argues that Blue Earth should have accounted for nearly the entire $44 million purchase price as mere "goodwill," not as the plans' value, because the plans were not separately "identifiable assets" with their own value and were not contracts that were transferable or that created "legal rights." In addition, without explanation, the report on Form 10-Q for the period ending March 31, 2014, reclassified some of the term sheets as $33,745,418 in "Property and equipment, net." (Ex. 8 at 3.) Under GAAP, "[p]roperty, plant, and equipment typically consist of long-lived tangible assets used to create and distribute an entity's products and services and include ... Land and land improvements[;] Buildings[;] Machinery and equipments[; or] Furniture and fixtures." FASB ASC 360-10-05-3. Plaintiff contends that the assets should have been classified as "intangible assets" because they lacked a "physical substance," and Blue Earth had virtually no tangible property and equipment and had not contracted to build any plants.
In opposition, defendants assert that the complaint does not adequately plead that Blue Earth's accounting treatment for the CHP assets was incorrect. Defendants point out that GAAP's definition of "property and equipment" in FASB ASC 360-10-05-3 is not exclusive in that it only spells out "typical" situations. In addition, defendants assert that the benefits of an agreement in principle to construct revenue-generating power plants can be transferred and therefore are "identifiable" under GAAP. Furthermore, under the accounting guidance for the initial measurement of "property and equipment," the cost of an asset includes the cost to bring it to "the condition ... for its intended use" and "the activities necessary to bring it to that condition." FASB ASC 360-30-1. FASB ASC 360-10-20 provides:
The term activities is to be construed broadly. It encompasses physical construction of the asset. In addition, it includes all the steps required to prepare the asset for its intended use. For example, it includes administrative and technical activities during the preconstruction stage, such as the development of plans or the process of obtaining permits from governmental authorities....
FASB ASC 360-10-20. Accordingly, as it began construction, acquired permits, and requisitioned materials, Blue Earth classified the assets as "Property & equipment."
Moreover, "[a]ccountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." Thor Power Tool Co. v. C. I. R. , 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). "Thus, one person's accounting decisions on a given matter, even if open to debate, are not necessarily improper, much less intentionally misleading." In re Officemax, Inc. Securities Litig. , Civ. No. 1:00CV2432, 2002 WL 33959993, at *17 (N.D. Ohio Mar. 26, 2002). Here, other than plaintiffs disagreement after the fact, there is no allegation that anyone disagreed with Blue Earth's accounting of the CHP assets at the time.
As set forth in detail above, the SEC examined the disclosures and accounting related to the CHP assets and accepted Blue Earth's explanation that the assets were term sheets and plans to build plants. Blue Earth's response letter dated April 11, 2014, to the SEC stated: "There were no contract rights existing beyond the right to build the plants at the time of the purchase of IPS/GREG." (Ex. 12 at 5.)
*1348 Although plaintiff claims that Thomas misled the SEC by stating that "[a]11 of the projects have begun preconstruction work including siting and permitting as of this date [and e]quipment has been ordered and is being built for the first 5 projects," the complaint does not allege that these facts were not true at that time. (Compl.¶ 109; Ex. 12 at 5.) Following the SEC correspondence, Blue Earth amended its 2013 10-K to supplement the information it had previously disclosed about the CHP assets and added that "the Company has signed a letter of intent with a large U.S. and international protein provider to design, build and operate seven (7) CHP plants." (Ex. 14 at 6.) The SEC never suggested that the accounting was incorrect or that it should be changed.
There is no allegation that Blue Earth's audit committee ever concluded or suggested that the assets were misclassified. There is no allegation that Powell, who succeeded Thomas as CEO and who was a former CFO and partner at Arthur Andersen, ever questioned the accounting. Blue Earth continued to classify the CHP assets as "Property & equipment" in its financial statements, which were signed by Powell as CEO and interim CFO. (Ex. 20 at 3, 28.) Blue Earth's Form 10-K for the period ending December 31, 2014, was restated twice with Powell as CEO of Blue Earth. Each time, Blue Earth's outside auditors reviewed and signed off on the financial statements, which were ultimately signed by Powell and the Board. But neither restatement had anything to do with accounting of the CHP projects. The amount of assets identified as "Property & equipment" never changed. (Ex. 21 at F-1-F-3, 81; Ex. 22 at F-1-F-4, 81.)
In support of its argument that defendants were aware of their accounting error, plaintiff points to an "internal accounting document Blue Earth produced in bankruptcy [that] labels the seven potential cogeneration plants as representing a total of $44,035,502 in intangible value.' " (Compl. ¶ 42(a).) The complaint does not allege who prepared this document. Nor does it allege when or even whether Thomas or Francis ever saw it. The complaint also does not allege that the document raised questions or concerns about whether the CHP accounting was incorrect. The document, which was created after December 31, 2015, did not exist at the time of the alleged false statements or when Thomas and Francis were employees of Blue Earth, (Id. at ¶ 75(c).) As such, the document does not indicate that defendants were aware of their alleged accounting mistake.
Plaintiff also cites to a confidential witness, a senior Blue Earth executive (the "CW"), who purportedly claimed that "the classification of the term sheets on Blue Earth's balance sheet was a topic of extensive discussion" and that "Thomas and Francis were both directly involved in the decision." (Id. at ¶ 121.) Plaintiff fails to allege that anybody raised a concern during the "extensive discussion[s]" that the accounting for the CHP asserts was incorrect. There is nothing improper about the people within Blue Earth discussing the matter extensively to determine the proper accounting of the CHP assets. The courts in this circuit "have repeatedly held that confidential witness allegations, to be accorded much weight, must flesh out at least some of the details of the conversations, meetings, and internal documents that they describe." Morgensen v. Body Cent. Corp. , 15 F.Supp.3d 1191, 1219-20 (M.D. Fla. 2014). See also Garfield v. NDC Health Corp. , 466 F.3d 1255, 1265 (11th Cir. 2006) (finding that "testimonial evidence is not set forth with requisite detail because [plaintiff] failed to allege what was said at the meeting, to whom it was said, or in what context"). Plaintiff's failure to *1349 allege that anyone at Blue Earth claimed that the accounting for the CHP assets was incorrect "raises an inference that such fraud was not in fact discussed." FindWhat Investor Group v. FindWhat.com , 658 F.3d 1282, 1304 (11th Cir. 2011). Plaintiff has "pointed to no tips, letters, or conversations raising inferences that [defendants] knew of any fraud." Plymouth County Ret. System v. Carter's Inc. , No. 1:08CV02940-JOF, 2011 WL 13124501, at *19 (N.D. Ga. Mar. 17, 2011). Accordingly, plaintiff has failed to adequately plead its securities fraud claim pursuant to Rule 9(b).
Even if the court were to assume that plaintiff has pled sufficient facts to establish that there were GAAP violations, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." In re Comshare Inc. Securities Litig. , 183 F.3d 542, 553 (6th Cir. 1999). See also Fine v. Am. Solar King Corp. , 919 F.2d 290, 297 (5th Cir. 1990) (holding that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter"). Accounting problems "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action." Abrams v. Baker Hughes Inc. , 292 F.3d 424, 433 (5th Cir. 2002). To withstand dismissal in a securities fraud action, the complaint must plead facts supporting a strong inference of scienter. The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder , 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The PSLRA requires a plaintiff to set forth facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).
In the Eleventh Circuit, a plaintiff's pleadings are sufficient if the facts would be sufficient to raise a strong inference of severe recklessness. Bryant v. Avado Brands, Inc. , 187 F.3d 1271, 1283 (11th Cir. 1999). The Eleventh Circuit has held that "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Woods v. Barnett Bank of Ft. Lauderdale , 765 F.2d 1004, 1010 (11th Cir. 1985).
Furthermore, the Eleventh Circuit has rejected the notion that "allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter." Bryant , 187 F.3d at 1285. The court of appeals pointed out that allegations of motive and opportunity could be relevant to demonstrate scienter but concluded that motive and opportunity are specific kinds of evidence rather than a substantive standard. In re Sci.-Atlanta, Inc. Securities Litig. , 239 F.Supp.2d 1351, 1365 (N.D. Ga. 2002), aff'd sub nom. Phillips v. Sci.-Atlanta, Inc. , 374 F.3d 1015 (11th Cir. 2004). Thus, scienter may be shown by detailing either direct or circumstantial evidence of defendants' actual knowledge or severely reckless state of mind. See In re JDN Realty Corp. Securities Litig. , 182 F.Supp.2d 1230, 1241 (N.D. Ga. 2002).
As defendants point out, the complaint does not contain any particularized fact suggesting that either Thomas or Francis acted with an intent to deceive at the time of the alleged misstatements. Plaintiff's argument that scienter can be inferred because of the "obvious" nature and magnitude *1350 of the alleged GAAP violation cannot be reconciled with the fact that there is no allegation that anybody, including the SEC, questioned the accounting for the CHP assets. See Proter v. Medifast, Inc. , Civ. No. GLR-11-720, 2013 WL 1316034, at *15 (D Md. Mar. 28, 2013) (holding that "it cannot at once be the case that the accounting errors were simple, clear-cut determinations and , at the same time, that the Company's independent auditors repeatedly failed to discover those "obvious" errors"). This is not a case where, for example, the company restated its earnings because it recognized non-existent and premature revenue, In re MicroStrategy, Inc. Sec. Ltig. , 115 F.Supp.2d 620 (E.D. Va. 2000), or the company inflated revenues through a "sham" tax strategy that involved illusory payments to a subsidiary. In re Ebix, Inc. Sec. Litig. , 898 F.Supp.2d 1325 (N.D. Ga. 2012).
In Espinoza v. Whiting , 8 F.Supp.3d 1142, 1147-48 (E.D. Mo. 2014), a company restated its incorrect accounting treatment of a court-ordered environmental remediation plan following repeated questions from the SEC. The Espinoza court rejected plaintiff's argument that the restatement showed that defendants acted with at least severe recklessness and concluded that the SEC's questions and subsequent restatement did not raise an inference of scienter because the company's chief accounting officer and outside auditors had both approved the earlier financial statements and believed them to be correct. Id. at 1151. Similarly, in this case, Blue Earth's CFO signed off on the financial statements and its auditors[3] repeatedly issued unqualified approvals of financial statements that classified the cogeneration plants as "Construction in progress" or "Property & equipment." (Ex. 2 at F-1, F-21; Ex. 10 at F-1, F-25.) In addition, there is no allegation that anybody, including the SEC, ever disagreed with the accounting treatment. Blue Earth restated its 2014 Form 10-K twice in October 2015 and February 2016, for reasons unrelated to the CHP assets. (Exs. 21, 22.) Blue Earth's auditors vetted both restatements and again did not challenge the cogeneration projects as "Property & equipment." (Ex. 21 at F-1 to F-3, Ex. 22 at F-1 to F-3.) Although "the lack of restatement or an unqualified independent auditor's opinion does not absolve or shield ... defendant[s] from liability ... here, plaintiff ... ha[s] failed to plead facts suggesting improper accounting." In re Levi Strauss & Co. Securities Litig. , 527 F.Supp.2d 965, 987 (N.D. Cal. 2007). In light of all the facts set forth above, "the court concludes that the complaint fails to raise a plausible inference that the financial statements were misstated in the manner alleged by plaintiff...." Id. at 988.
Plaintiff then contends that defendants were motivated to commit fraud because their family members owned shares *1351 that were registered for sale. (Compl. ¶¶ 127-28.) "Stock sales ... are only relevant to scienter when they are suspicious." Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc. , 594 F.3d 783, 793 (11th Cir. 2010). There is no allegation that stock sales by entities affiliated with defendants' family members were under suspicious circumstances. (Id. at ¶¶ 127-28.) See Wozniak v. Align Tech., Inc. , 850 F.Supp.2d 1029, 1045 n. 10 (N. D. Cal. 2012) (rejecting plaintiff's argument that stock sales by defendant's family members supported an inference of scienter). In addition, the complaint does not allege any suspicious stock sales by defendants. In fact, neither Thomas nor Francis is alleged to have sold any stock. This fact negates an inference of scienter. In re HomeBanc Corp. Sec. Litig. , 706 F.Supp.2d 1336, 1359 (N. D. Ga. 2010).
Scienter cannot be inferred from the fact that defendants held high-level positions at Blue Earth. "It is ... not sufficient for the purposes of pleading scienter to state that based on their positions in the company, the individual defendants must have known the truth." City of Pompano Beach General Employees' Retirement System v. Synovus Financial Corp. , 2011 WL 13130185, at *21 (N. D. Ga. May 19, 2011). "[S]uch a general, conclusory statement provides only weak support, if any, for an inference of ... scienter." Horizon Asset Mgt. Inc. v. H & R Block, Inc. , 580 F.3d 755, 762 (8th Cir. 2009). Moreover, the issue here is not whether defendants knew about the company's operations, but whether they knew that the company allegedly violated GAAP in accounting for those operations. As set forth above, the complaint does not allege any facts to establish that knowledge.
Plaintiff alleges that Blue Earth's financial statements were misleading because Blue Earth failed to adequately disclose that the power-plant projects were mere term sheets. (Id. at ¶¶ 136-37, 139-41) As set forth in detail above, however, Blue Earth repeatedly disclosed that the CHP assets were "designs and plans" to build power plants and that "there were no contract rights to build them. (Ex. 14 at 6; Ex. 15 at 4; Ex. 16, Attach. 99.1 at 1.) Plaintiff then argues that defendants "splintered" or "buried" information about the CHP assets in "a labyrinth of footnotes." The "notes" are significant parts of the financial statements,[4] and the documents expressly warn the readers at the bottom of several pages that "[t]he accompanying notes are an integral part of these consolidated financial statements."[5] (Ex. 7 at 3-6.) In addition, the relevant notes in this case are specifically entitled in bolded capital letters as "Construction in progress" or "Property & equipment." In light of the substantial financial values given to these assets, the court finds it unreasonable that an investor would not read these notes. This is not a case where plaintiff "buried [the information] in vaguely worded footnotes at the end of its financial statements" using "the language ... [which] makes it virtually impossible to discern what exactly the company is alluding to."
*1352 In re Alstom SA Sec. Litig. , 406 F.Supp.2d 433, 453 n. 11 (S.D.N.Y. 2005).
In its quarterly statement on Form 10-Q for the period ending September 30, 2013, Blue Earth explained that "[t]he cost of assets acquired [were] capitalized and allocated to the several projects to be constructed" as "Construction in progress." (Ex. 7 at 11.) In its annual statement on Form 10-K for the period ending December 31, 2013, Blue Earth explained that "designs for cogeneration plants" accounted for the bulk of its Construction in Progress and that the $44,035,500 purchase price resulted "in a construction in progress asset of $44,029,229." (Ex. 2 at F-21, F-27.) When Blue Earth reclassified the CHP assets as "Property & equipment," it identified the assets as "Cogeneration plants (under construction)." (Ex. 8 at 11.) Blue Earth's public statements "must be read in the context of all available information." In re KLX, Inc. Sec. Litig. , 232 F.Supp.3d 1269, 1277 (S.D. Fla. 2017). Plaintiff "cannot base [its] claims on an inference drawn from disclosure[s] in one document ... if that inference contradicts more specific disclosure[s] in another document." In re Fannie Mae 2008 Sec. Litig. , 742 F.Supp.2d 382, 401 (S.D.N.Y. 2010). Any reasonable investor who read Blue Earth's public statements could not have been misled about the status of the CHP assets.[6]
Plaintiff's allegation that defendants committed fraud because the Company needed capital must also be rejected. The "desire to make a company seem more profitable is a desire universally held among corporations and their executives, and thus insufficient to support an inference of scienter." Horizon Asset Mgmt. Inc. , 580 F.3d at 766 (internal quotation and citation omitted). Plaintiff has alleged nothing more than the usual circumstances of executive employment here. See also Druskin v. Answerthink, Inc. , 299 F.Supp.2d 1307, 1338 (S. D. Fla. 2004) (holding that "[d]efendants' alleged desire to meet quarterly projections, find a buyer for the Company, and increase the value of their stock options do not raise a strong inference of scienter").
The court also finds unpersuasive plaintiff's allegation that in February 2015, Thomas and Francis misrepresented that they had "take-out financing" "lined up" to repay plaintiff's loan. (Compl. ¶ 49.) Plaintiff claims that this statement was false and misleading when made because the financing never came to fruition. It is not clear what plaintiff means by "take-out financing" or "lined up." Allegations that are "broadly and/or vaguely worded" are insufficient to satisfy heightened pleading standards. Ruble v. Rural/Metro Corp. , No. CV-99-0822-PHX, 2001 WL 1772319, at *10 (D. Ariz. Jan. 26, 2001). There is no allegation from which to infer that Blue Earth did not have "take-out financing" "lined up" in February 2015. Nor are there any allegations of reports or emails indicating that Thomas or Francis knew that Blue Earth did not have a financing "lined up." The fact that the financing did not actually occur does not indicate that Blue Earth did not have such financing "lined up" at the time. Such conclusory allegations are insufficient to show that the statement was false when made. See *1353 Belmont Holdings Corp. v. Sun Tr. Banks, Inc. , No. 1:09CV1185-WSD, 2010 WL 3545389, at *7 (N.D. Ga. Sept. 10, 2010) (rejecting "speculative conclusion that because SunTrust later revised its ... loan loss provision, its internal controls must initially have been inadequate and, thus, SunTrust's statements about its controls were necessarily misleading"). In addition, in each of the notes, plaintiff agreed that it was not relying on any oral or written statements outside of the representations in the agreement. These contractual provisions "preclude[ ] the plaintiff from establishing reasonable reliance" on alleged oral statements regarding "take-out financings." Hall v. Coram Healthcare Corp. , 157 F.3d 1286, 1290 (11th Cir. 1998). See also Rissman v. Rissman , 213 F.3d 381, 383 (7th Cir. 2000) (adopting the rule that "non-reliance clauses ... preclude any possibility of damages under the federal securities laws for prior oral statements").
Considering all the alleged facts holistically, the court cannot infer scienter from the facts in the complaint. Plaintiff's allegation that defendants' GAAP violations were a part of a larger scheme to mislead investors about the status of Blue Earth's cogeneration plants is not supported by the facts in the complaint. (Compl. ¶ 134.) The Supreme Court advises that the inference of scienter "must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs , 551 U.S. at 314, 127 S.Ct. 2499. The inference must be "strong in light of other explanations." Id. at 324, 127 S.Ct. 2499. As defendants assert, to find scienter, the court would have to conclude that Blue Earth's CFO (who is not a defendant), its new CEO (a former partner at Arthur Anderson), its audit committee, and its independent auditors, all agreed to account for the CHP assets in a way that plainly violated GAAP on its face. The court would also have to assume that defendants held onto their Blue Earth stock, suffering substantial losses, even though they purportedly knew that Blue Earth was a sham. The court further would have to assume that defendants believed that plaintiff, a sophisticated investor, would ignore the company's public disclosures as to the status of the CHP plants, even though the assets made up more than half of the company's value. Plaintiff could have learned everything it needed to know about the CHP assets by reading Blue Earth's public statements, including the prospectus that was filed a month before plaintiff was approached for investing in Blue Earth. (Ex. 15.) As such, the court finds that plaintiff's complaint has failed to allege with particularity a strong showing of scienter on the part of defendants.
Accordingly, the court hereby dismisses plaintiff's Section 10(b) and Rule 10b-5 claims.[7] In light of this holding, the court must also dismiss plaintiff's Section 20(a) claims against the individual defendants because "a primary violation of the securities law is an essential element of a Section 20(a) claim for derivative liability." Damian v. Montgomery County Bankshares, Inc. , 255 F.Supp.3d 1265, 1283 (N.D. Ga. 2015). Because plaintiff has failed to sufficiently allege its Section 10(b) and Rule 10b-5 claims, its federal claims against the individual defendants must also fail. See Garfield , 466 F.3d at 1261 (holding that "the success of [plaintiff]'s section 20(a) claim turns on the resolution of its claims under Section 10b and Rule 10b-5").
*1354 Finally, the court must dismiss plaintiff's state law securities fraud and misrepresentation claims. "For the claims alleging fraudulent conduct-i.e., the claims for fraud, collusion, and negligent misrepresentation-[plaintiff must] plead with particularity the actions of [defendant] that form the basis of those claims as required by Rule 9(b)." Smith v. Ocwen Financial , 488 F. App'x 426, 428 (11th Cir. 2012). See also Damian , 255 F.Supp.3d at 1284 (holding that "[t]he elements of common law fraud and negligent misrepresentation under Georgia law are essentially the same as the elements of a 10b-5 claim, except for the level of scienter required to prove negligent misrepresentation"). For the reasons set forth above, the court finds that plaintiff's state law fraud and negligent misrepresentation claims must be dismissed based on its failure to sufficiently plead a material misstatement or omission.
In addition, plaintiff has failed to plead reasonable reliance, a required element for the common law fraud and misrepresentation claims. Tri-State Consumer Ins. Co., Inc. v. LexisNexis Risk Solutions Inc. , 823 F.Supp.2d 1306, 1320 (N.D. Ga. 2011) ; Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc. , 267 Ga. 424, 426, 479 S.E.2d 727 (1997). "Georgia law places a significant due diligence burden on sophisticated parties engaged in arms-length transactions." Tri-State Consumer Ins. Co., Inc. , 823 F.Supp.2d at 1320 (internal quotation and citation omitted). "A plaintiff cannot show justifiable reliance if he has failed to exercise due diligence to discover the information withheld." Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp. , 4 F.Supp.2d 1198, 1205 (S.D. Ga. 1998). Here, if plaintiff had reviewed the internal audited financial statements, it would have known that the CHP assets were non-binding term sheets and that the value placed on those assets was the price paid for IPS/GREG. (Ex. 14 at 6; Ex. 15 at 4.) Plaintiff cannot plead that it conducted reasonable due diligence. See Hanover Ins. Co. v. Carroll , Civ. No. 1:13-cv-01802-SCJ, 2015 WL 11163644, at *7 (N.D. Ga. June 16, 2015) (holding that review of internal audited financial statements is insufficient to meet a sophisticated party's significant due diligence burden).
III. Conclusion
For all the foregoing reasons, the court hereby GRANTS defendants' motion to dismiss [22]. The clerk of the court is hereby DIRECTED to CLOSE this case.
IT IS SO ORDERED , this 3rd day of October, 2017.

On a motion to dismiss, the court may consider the full text of SEC filings, documents integral to or incorporated by reference into the complaint, and any matter of which the court may take judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd. , 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). See also Brooks v. Blue Cross & Blue Shield , 116 F.3d 1364, 1369 (11th Cir. 1997) (holding that "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal"); Fed. R. Evid. 201(b) (the court may take judicial notice of "a fact that is not subject to reasonable dispute").

Blue Earth's amended annual report on Form 10-K for the period ending December 31, 2014, stated that its "primary focus in the near term is expected to be organic growth within [its] combined heat and power (CHP), solar engineering, procurement, and construction (EPC) solar and energy efficiency (EE)/technology business units." (Ex. 14 at 6.)

Plaintiff cites to an order of Public Company Accounting Oversight Board ("PCAOB") dated January 24, 2017, which revoked the registration of HJ & Associates, Blue Earth's outside auditor, in part because the PCAOB found that the auditor "failed to gather sufficient appropriate audit evidence to evaluate Blue Earth's purchase accounting for three acquisitions (including IPS and GREG) ... [and] failed to perform any procedures, aside from recalculating the excess purchase price, to evaluate whether the values that management assigned to the individual intangible assets represented the fair value of those assets as of the acquisition dates." (Ex. I ¶ 42; § IV(B).) Pretermitting defendants' argument that this order cannot be considered here because it was not referenced in the complaint, the court notes that the order accepted a settlement offer from the auditor, who did not admit any of the findings in the order. (Ex. I ¶ 42.) In addition, PCAOB appears to have closely examined Blue Earth's financial statements, including its acquisition accounting, and never disputed Blue Earth's classification of the CHP assets. (Id. at ¶¶ 33-44.)

The SEC counsels "beginner" investors that it is "so important to read the footnotes" because "footnotes to financial statements are packed with information," including "the accounting policies that are most important to the portrayal of the company's financial condition and results." (SEC, Beginner's Guide to Reading a Financial Statement, https://www.sec.gov/ reportspubs/ investorpublications/investorpubsbegfinstmtguidehtm.html (Feb. 5, 2007).)

In quarterly statements, Blue Earth also suggests to the reader that "these condensed financial statements be read in conjunction with the financial statements and notes thereto included in the Company's [annual] audited financial statements." (Ex. E at 8.)

Plaintiff argues that GAAP violations in financial statements are misleading notwithstanding "footnote or other disclosures." 17 C.F.R. § 210.4-01(a)(1)(2011) provides that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." Here, plaintiff's allegations are insufficient to establish that defendants violated the GAAP, and the SEC accepted defendants' accounting.

In light of this holding, the court need not address additional/alternative grounds for dismissal.